IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

JORDAN DALE,

Plaintiff,

v.

SEAN JENNEIAHN; and
BOARD OF COUNTY
COMMISSIONERS OF
WELD COUNTY,

Defendants.

**COMPLAINT AND JURY DEMAND**

Plaintiff, Jordan Dale, by and through his attorneys at the Civil Rights Litigation Group, for his Complaint and Jury demand, states and alleges as follows:

### INTRODUCTION

1. This is a civil rights action seeking damages against Weld County Deputy Sean Jenneiahn and Weld County, Colorado, for the use of excessive canine force on a man who had surrendered before he was attacked. Mr. Dale initially fled after being threatened with a police dog but subsequently stopped, turned toward the pursuing deputy from approximately 100 yards away, and raised his empty hands into the universal position of surrender. Deputy Jenneiahn nevertheless repeatedly commanded his K9 to attack Mr. Dale despite his clear surrender, and allowed the dog to continue biting even after Mr. Dale was handcuffed, resulting in at least 12 distinct dog-bite wounds each one of which cause Mr. Dale to suffer intense physical pain, permanent disfigurement, and permanent impairments.

2. This is not Defendant Jenneiahn's first instance of excessive force or misrepresentation in official records. While employed at the Stockton and Lafayette Police Departments, he established a pattern of using unjustified force against non-threatening individuals who were neither fleeing nor resisting arrest, while falsely claiming officer safety concerns. In federal case #19-cv-03289-RM-NRN, public evidence demonstrated that Jenneiahn employed excessive force, materially misrepresented facts, and was formally criticized by the City of Lafayette for his documented history of truth exaggeration. Although the court acknowledged the facts likely constituted a constitutional violation, it ultimately dismissed the case on qualified immunity grounds, determining that no precisely analogous canine excessive force case had been previously decided by the Tenth Circuit.

3. Defendant Weld County hired Jenneiahn during the pendency of case #19-cv-03289-RM-NRN and knew that there was competent evidence showing Defendant Jenneiahn had used excessive force and had veracity problems, but it proceeded to hire and retain him anyway – in reckless disregard for the risk that he would harm others in the same way. The County thereafter failed to meaningfully train and supervise the officer, despite this and other knowledge of his history, and has continued to enable him with the power of force while exposing him to other persons without a partner, supervisor, or other oversight, which inevitably led to the unnecessary force and distortion of the truth in this case. To keep the citizens who might interact with him and his canine safe, this deputy must be stopped and the County held responsible.

4. Plaintiff seeks compensation for the physical, dignitary, emotional, and economic injuries that he suffered, including temporary and permanent injuries from the dog bite, disability, scarring and deformation, emotional trauma, medical bills, lost employment, and punitive sanctions necessary to punish the deputy for his flagrant disregard of Plaintiff's rights and safety. Furthermore, Plaintiff seeks a clear declaration from this Court that the conduct of the deputy

violated the United States. and Colorado Constitutions so that he does not continue to harm members of the public with impunity.

## JURISDICTION AND VENUE

5. Plaintiff's federal claims are brought pursuant to 42 U.S.C. §1983 and the Constitution of the United States.

6. Plaintiff's state law claims are brought pursuant to C.R.S. § 13-21-131 and the Colorado Constitution.

7. This Court has subject matter jurisdiction of the federal claims pursuant to 28 U.S.C. §1331. This Court has supplemental subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because all the events alleged herein occurred in the State and District of Colorado.

9. Jurisdiction supporting the Plaintiff's claim for attorney's fees and costs is conferred by 42 U.S.C. §1988 and C.R.S. § 13-21-131(3).

## PARTIES

10. Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

11. Plaintiff Jordan Dale was at all times relevant to the claims set forth herein a resident of the State of Colorado.

12. Defendant Sean Jenneiahn was, at all times relevant to the claims in this action, employed as a POST-certified K-9 Police Handler of a dog named "Cowboy," by the Weld County Sheriff's Department, and acted as a peace officer under color of state law. He is identified in his individual capacity.

13. Defendant Board of County Commissioners of Weld County, a/k/a Weld County, is

a municipality established under the laws of Colorado. It is responsible for hiring and retaining Defendant Deputy Jenneiahn and is responsible for all police policies, training, and supervision required to constrain the conduct of the deputy under its employ.

## FACTUAL BACKGROUND

14. On May 21, 2024, a police officer from the Town of Mead, Colorado contacted Weld County for an agency assist to arrest Mr. Dale on outstanding warrants.

15. Weld County dispatched Defendant Deputy Jenneiahn with his K-9 Cowboy, and officers from both jurisdictions planned a surprise arrest.

16. The officers covertly waited for Mr. Dale to arrive at a residence in Mead that the officers had been monitoring.

17. Once Mr. Dale arrived, the officers drove up next to Mr. Dale's vehicle and Defendant Jenneiahn yelled out, "you're gonna get bit! Stop or you're gonna get bit."

18. Fearing the use of serious and excessive force, Mr. Dale accelerated away and fled.

19. Mr. Dale passed by Defendant Jenneiahn's vehicle, as he left the area.

20. Defendant Jenneiahn radioed to other officers that Dale had "rammed" his vehicle.

21. However, there was no collision and no damage caused to either vehicle.

22. Defendant Jenneiahn turned his car around, and with no problem with the vehicle's functioning, began pursuing Mr. Dale.

23. Eventually Mr. Dale drove into a grass field in a rural area, where he crashed and disabled his vehicle.

24. Mr. Dale got out and ran toward a nearby house on foot.

25. Defendant Jenneiahn parked near the crashed car, got out with his K-9, and pursued Mr. Dale on foot.

26. As Mr. Dale neared a home, he decided to stop and give himself up.

27. With more than 100 yards between them, Mr. Dale conspicuously stopped, turned around, and while standing still and facing the pursuing deputy, he put his empty hands up in the air into the universal position of surrender. *See* below:



28. Mr. Dale yelled out "I surrender."

29. Defendant Jenneiahn was within eyesight and earshot of Mr. Dale. He observed Mr. Dale stop, turn around, raise his hands, and express a clear intent to surrender.

30. However, frustrated that Mr. Dale had led him on a chase, he decided to take out his frustration on Mr. Dale by ending the pursuit with force – regardless of the lack of necessity.

31. Defendant Jenneiahn yelled out a command for this K-9 to bite Mr. Dale.

32. As Defendant Jenneiahn continued to run and close the distance between the two

men (while Mr. Dale stood stationary), he continued to yell out for the canine to "*stellen* that man."[1]

33. Jenneiahn observed Mr. Dale surrendering with his hands in the air for at least 10 seconds, but he did not stop the K-9 from biting.

34. Quite the contrary, Defendant Jenneiahn repeated the bite command at least four times as he advanced to within approximately 90 yards, 50 yards, 30 yards, and no more than 20 yards away from Dale.

35. At each juncture, he saw that Mr. Dale had his hands up. Yet, Defendant Jenneiahn continued to yell for the K-9 to attack and bite Mr. Dale. *See, e.g.* below:



36. The K-9 reached Mr. Dale first. As it did, it could see there was no attempt to resist or flee and there was no threat or struggle. It chose not to bite Mr. Dale.

37. Instead of biting, the K-9 circled Mr. Dale while Mr. Dale stepped to the side and allowed the K-9 to circle and observe him with his hands up. *See* below:

---

[1] "*Stellen*" is the bite command used by this officer to order his police K-9 to attack.



38.     Although both the K-9 and Defendant Jenneiahn could see that Mr. Dale was not threatening, fleeing, or actively resisting arrest, and that he was clearly surrendering, Defendant Jenneiahn continued to order the dog to attack.

39.     Defendant Jenneiahn did not slow down, and did not provide commands or warnings that would allow Mr. Dale to avoid violence.

40.     Instead, he continued charging at Mr. Dale while Me. Dale was surrendering in an apparent effort to tackle him with significant force.

41.     Mr. Dale stood still and instinctively braced for impact, with his open and empty hands still in the air, yelling, "don't tackle me…come on dude."

42.     Defendant Jenneiahn grabbed Mr. Dale by his t-shirt and spun or pulled him to the

ground in an unnecessarily prolonged and dramatic takedown that made it appear to the K-9 that the officer was wrestling with Mr. Dale. Defendant Jenneiahn was the only one of the two men applying physical force.

43. Defendant Jenneiahn knew that the appearance of a struggle would cause the K-9 to start biting, because he had trained the K-9 to get excited by the appearance of struggle. He had trained the dog to bite and to respond as if Mr. Dale was a chew-toy.

44. Mr. Dale did not resist, but he also had no idea what the officer was trying to do with his body. Without communication or command, he simply tried to remain standing until he realized the officer was trying to push or pull him to the ground, at which time he allowed himself to be brought to the ground.

45. Defendant Jenneiahn did not provide any reasonable commands, communications, or guidance to Mr. Dale. Instead, he continued to yell for the K-9 to bite Dale.

46. Defendant Jenneiahn yelled for the K-9 to bite at least three times while he held onto Mr. Dale's t-shirt and was pulling him to the ground.

47. The additional commands, combined with what must have looked like a struggle to the animal, caused the animal to predictably get very excited and he repeatedly bit Mr. Dale.

48. Mr. Dale screamed out in pain and was overwhelmed by the force he felt.

49. Defendant Jenneiahn yelled "hands out, hands out" as he rolled Mr. Dale over and the K-9 continued to bite him.

50. Mr. Dale was reasonably confused and in excruciating pain, but did not resist the officer. He tried to do as demanded and put his hands out.

51. Within seconds of yanking Mr. Dale to the ground, the officer had both of Dale's hands pulled behind his back in a prone and subdued position.

52. There was obviously no need for continued force. But the officer continued to command and allow the dog to bite Dale's legs while slowly putting the handcuffs on.

53. The officer took approximately 15 to 20 seconds to put the handcuffs on while the dog continued biting Mr. Dale and the officer failed to order the dog to stop.

54. Even after handcuffing Mr. Dale, the officer continued to let the K-9 chew on Mr. Dale for another (approximate) 15 to 20 seconds.

55. Defendant Jenneiahn knew how to force the K-9 to stop biting, but deliberately failed to stop the dog.

56. Defendant Jenneiahn failed to provide immediate first aid, despite seeing and acknowledging that Mr. Dale was bleeding profusely.

57. Mr. Dale suffered a total of approximately 12 dog attack wounds, documented by officers, including:

   a. three puncture wounds on the inside of his lower leg;
   b. a 3-inch laceration on the top of his shin;
   c. three 1-inch vertical lacerations on the outside of his leg;
   d. an additional puncture wound on the outside of his leg, next to the vertical lacerations;
   e. a 1-inch horizontal laceration across the lower portion of the shin;
   f. a "larger" puncture on the inside of the shin; and
   g. two puncture wounds on the knee pit.

58. Mr. Dale required hospitalization, and suffered significant physical and emotional trauma, including physical scarring, disfigurement, disability, and impairment that are likely to remain and leave lingering effects for the rest of his life, in addition to destroying tattoos on his body.





59. In police reports, Defendant Jenneiahn attempted to justify his force by asserting that Mr. Dale "had no intention to surrender."

60. This was not the first time Defendant Jenneiahn had used excessive canine force or misrepresented the truth regarding his use of force. Defendant Jenneiahn has engaged in a pattern of using excessive force, making material misrepresentations about the facts in order to justify or conceal the conduct, and then, when caught, moving to other police departments to avoid

repercussions.

61. For example, between 2004 and 2006, then police officer Sean Jenneiahn - while working for the Stockton Police Department in California, was sued for using excessive force on Virgil Graves. Evidence was presented during summary judgment that Jenneiahn used a police baton in conjunction with a police K-9 on Graves, without justification, who had been subdued and placed in the back of a patrol vehicle. Jenneiahn's story about the incident differed materially from witnesses. Summary Judgment was denied and Jenneiahn moved to Colorado to seek a new police job while the case was pending. The City of Stockton ultimately paid approximately $150,000 to resolve the case.

62. Between 2007 and 2020, Sean Jenneiahn worked as a K-9 officer with the Lafayette Police Department. Toward the end of his tenure there, he used excessive force in at least three instances before leaving the department to move to the Weld County Sheriff's Department in the midst of a police excessive force case. These instances include the following:

   a. On January 5, 2018, Officer Jenneiahn was patrolling with a partner around an area that was reported to have had a rash of criminal trespasses. Jenneiahn spotted a male and female smoking outside, which he considered to "look suspicious." Jenneiahn followed the male as he left, unlatched a gate, and walked inside a home. Jenneiahn pursued Aaron Hudson inside. Jenneiahn's K-9 searched and located the man hiding in a closet. Jenneiahn opened the closet door and saw Hudson standing, making no movements whatsoever. Hudson presented no threat and was not fleeing or actively resisting arrest at the time. Yet Jenneiahn ordered his K-9 to attack and bite the man "to prevent risk of injury to other officers." Mr. Hudson suffered serious injury.

   b. On January 13, 2018, Officer Jenneiahn was called to locate a suspect named Casey Gesick after a minor shoplifting call. Jenneiahn located the suspect lying on the ground next to a bush. The man presented no threat and was not fleeing or actively resisting arrest at the time. Other officers reported the suspect was lying on the ground, looking "like a turtle." Yet Jenneiahn represented that "approaching the suspect to take him into custody would put officers at a substantial risk of injury." Jenneiahn ordered the canine to bite and drag the man toward him, causing serious injuries.

   c. On February 17, 2018, Officer Jenneiahn was called to search for a man who had left a hospital without checking out, after the injured man suffering serious head

trauma and other injuries by third parties the previous evening. There were warrants out for his arrest, but no officer had immediately pursued or informed Adrian Martinez that he was wanted or being sought. Jenneiahn tracked the man to an outside closet in an apartment complex, where he had taken an IV out of his arm and fell unconscious. Jenneiahn opened the closet door and saw the man curled up in a fetal position, wearing nothing but his underwear, who did not move. Mr. Martinez presented no threat and was not fleeing or actively resisting arrest at the time. Yet Jenneiahn claimed that he was dangerous because Jenneiahn could not see his hands. Without any need, Jenneiahn ordered the canine to attack and bite Mr. Martinez while he laid constrained in the closet, surrounded by officers, and in a vulnerable position. Jenneiahn purposefully excited the dog to get him riled up, yelling "get him, get him," which resulted in Mr. Martinez being bitten for a prolonged period of approximately 20 seconds, which caused serious injuries and disability.

63. Jenneiahn was sued in federal case #19-cv-03289-RM-NRN due to the incident involving Mr. Martinez. During litigation, Jenneiahn misrepresented critical facts, including that Mr. Martinez had fled from custody, carjacked someone he simply sought a ride from, and resisted arrest. Expert testimony demonstrated that the involved officers collectively "formulated [conclusions] subsequent to the incident" as "a belated justification for [the use of force], even though [such factors] were not truly present or considered in the first place, during the incident." When an official 30(b)(6) representative for the City of Lafeyette was deposed, Commander Scott Emerson testified under oath that Jenneiahn "had problems with his honesty… [Jenneiahn] would use a piece of information and expand on it, ultimately adding information that wasn't true."

64. Jenneiahn left Lafayette PD in the midst of the excessive force case and moved to the Weld County Sheriff's Department, where additional excessive force incidents have taken place, including the use of excessive force involving Mr. Dale.

65. When Weld County publicly announced the hire of Jenneiahn in 2020, it included specific references to his previous two police employers, including the years he worked at each, demonstrating that its Sheriff's Department knew of his history at each department.

66. A competent and reasonable pre-hiring investigation would have revealed that Defendant Jenneiahn left each of those two departments in the midst of pending excessive force lawsuits where he was accused of using excessive force and distorting the truth.

67. The pleadings filed in each of the two excessive force cases identified were matters of public record. Both lawsuits provided competent, reasonable, and reliable evidence proving that Jenneiahn had used excessive force unjustifiably and had made material misrepresentations. The Martinez lawsuit highlighted the under-oath testimony of Commander Scott Emerson, which identified a history of known "problems with his honesty."

68. A competent and reasonable pre-hire investigation would have revealed Jenneiahn's history of excessive force, pattern of misrepresentations, and risk of harm to those he comes into contact with while armed with a badge and police K-9.

69. Weld County either knew of or failed to reasonably investigate Defendant Jenneiahn's force history, tendency for credibility issues, and risk to members of the public, and chose to hire and retain him despite the great risk that his recent work history showed he posed to Coloradans.

70. Furthermore, Defendant Weld County did not provide remedial training to stop Jenneiahn from using force in the ways he had before or basic recruit training concerning use of force issues to ensure he used his K-9 only within constitutional limits. Instead, Weld County permitted him to transfer in as lateral hire and permitted him to avoid such training.

71. Weld County failed to provide basic instruction and supervision to ensure he used canine force only within constitutional limits.

72. Weld County assigned Jenneiahn to work alone with his K-9, without a human partner or direct supervisor to oversee Jenneiahn to ensure he refrained from using excessive force and told the truth about police incidents.

**FIRST CLAIM FOR RELIEF**

**Excessive Force**
**42 U.S.C. § 1983, Fourth Amendment &**
**C.R.S. § 13-21-131, Colo. Con. Art. II, § 7**
**(Against Defendant Jenneiahn)**

73. Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

74. Defendant Jenneiahn intentionally and knowingly applied unnecessary, unreasonable, and excessive force to Plaintiff by ordering his K-9 to attack and bite Mr. Dale when Mr. Dale was clearly not threatening, fleeing, or resisting arrest. Despite Mr. Dale standing with his hands raised in surrender, Defendant Jenneiahn issued multiple attack commands as he closed the approximately 100-yard distance between them.

75. Rather than providing reasonable commands to facilitate a peaceful arrest, Defendant Jenneiahn unnecessarily charged into Mr. Dale, forcefully tackled him to the ground, and continued to command the K-9 to bite.

76. This force continued after Mr. Dale was in a prone and subdued position with his hands behind his back, and even after handcuffs were secured.

77. Defendant Jenneiahn thereafter failed to immediately provide first aid, which further exacerbated the impact and medical consequences of the injury's inflicted.

78. The quantum and duration of force used far exceeded what was necessary to effectuate a lawful arrest under these circumstances, particularly given Mr. Dale's clear surrender posture.Defendant Jenneiahn additionally and unnecessarily caused the K-9 to bite again and failed to timely stop the K-9 from biting well after handcuffs were placed on Mr. Dale.

79. Even if the deputy was justified in using some level of force to detain or arrest Mr. Dale, the force used was wholly unnecessary and reached a quantum and quantity far above and beyond that necessary to effectuate a lawful detention or arrest under the circumstances.

80. The actions described herein of Defendant Jenneiahn, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Fourth Amendment to the United States Constitution and Article II, §7 of the Colorado Constitution, including the right to freedom from unreasonable and excessive force. His actions were the primary and motivating and proximate cause of Plaintiff's injuries, including physical, emotional, economic, and dignitary harms.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983, Fourth Amendment**
*Monell – Reckless Hiring and Retention*
**(Against Defendant Weld County)**

81. Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

82. Defendant Weld County hired Defendant Jenneiahn and imbued him with the power and authority to use force on behalf of the County on March 31, 2020.

83. At the time of his hire, Defendant Weld County had either (a) performed a thorough background check, called former employers for references, and/or questioned Jenneiahn about his history and philosophy of using canine force, and reviewed former and pending lawsuits against him; or (b) failed to perform a reasonable and through background check before hiring the officer.

84. Through these affirmative inquiries or failures, Defendant Weld County knew or should have known that Jenneiahn had a history of using excessive force on people who were not threatening, fleeing, or resisting arrest and that he had a history of dishonesty.

85. Defendant Weld County hired Defendant Jenneiahn after a lawsuit had been filed in 2019, which remained pending at the time, accusing Defendant Jenneiahn of using excessive force by ordering a canine to attack a non-threatening and non-resistive suspect who was unconscious and lying in a fetal position in his underwear.

86. Defendant Weld County either knew or should have known that while a lawsuit was pending regarding Jenneiahn's use of excessive force in *Martinez v. Jenneiahn,* #19-cv-03289, public pleadings and evidence were presented showing that Jenneiahn engaged in excessive force, made material misrepresentations about it, and was criticized by the City of Lafayette's official 30(b)(6) representative—under oath—for engaging in a known history of exaggerating or misrepresenting the truth while working there.

87. Despite having knowledge of or ready access to publicly and privately available information that showed Jenneiahn used excessive force and made material misrepresentations while at other police agencies, Defendant Weld County hired and retained him.

88. By hiring and retaining Defendant Jenneiahn as a Weld County K-9 field officer and continuing to expose him to members of the public in spite this history, Weld County was deliberately indifferent to the likelihood that Defendant Jenneiahn would continue to commit similar types of misconduct against others, which has led to other instances of misconduct known by Weld County, including the unnecessary use of force and misrepresentations in this case.

89. Thus, by hiring and retaining Defendant Jenneiahn, in spite of this history, Defendant Weld County was a moving force and proximate cause of the excessive force and misrepresentation described herein.

### THIRD CLAIM FOR RELIEF
**42 U.S.C. § 1983, Fourth Amendment**
*Monell – Failure to Train or Supervise*
**(Against Defendant Weld County)**

90. Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

91. As a law enforcement agency, the Weld County Sheriff's Department had a duty to properly train and supervise Defendant Jenneiahn to use force only within constitutional limits

92. Given Defendant Jenneiahn's history of using excessive force and making misrepresentations, which was readily accessible via public records, Defendant Weld County had special knowledge of this officer's conduct patterns. It knew or should have known it had a duty to take reasonable steps to prevent Defendant Jenneiahn from using force excessively like he had in the past, to retrain him before allowing him to use canines during his interactions with Coloradans, and to closely supervise him until it was certain he knew how to and would likely constrain his use of force within constitutional limits.

93. Defendant Weld County failed to review prior instances of canine force with Defendant Jenneiahn to ensure he did not repeat the same types of mistakes and uses of excessive force he had used in the past.

94. Defendant Weld County failed to competently instruct Defendant Jenneiahn that he could not use force on subjects who are not threatening or otherwise fleeing or resisting arrest.

95. Defendant Weld County failed to instruct Defendant Jenneiahn that he could not use force on those who stop fleeing and surrender, despite the possibility that force may have previously been justifiable while someone fled or resisted arrest.

96. Defendant Weld Couty failed to provide practical instruction and examples to demonstrate how and why force on someone like Mr. Martinez or Mr. Dale would be unnecessary and unreasonable.

97. Defendant Weld County assigned Defendant Jenneiahn to duty without a partner or supervisor to oversee his conduct and communications, in order to ensure his force remained within constitutional limits and that his representations were truthful.

98. Defendant Weld County failed to review Defendant Jenneiahn's use of canine force with him on a regular basis to ensure it remained within constitutional limits.

99. Defendant Weld County failed to discipline Defendant Jenneiahn for using excessive

force and making misrepresentations during his time working for Weld County before this incident.

100. As a result, Defendant Weld County's failure to train and supervise the Defendant officer, while placing him in the field to work alone, exhibited deliberate indifference to the rights of Coloradans he was likely to interact with and was a moving force behind the excessive use of force in the case at bar, which proximately caused and contributed to Plaintiff's injuries.

**WHEREFORE**, Plaintiff respectfully prays that this Court enter judgment in his favor and against all Defendants for compensatory damages, as referenced above, for punitive damages, for interest as allowed by law, for costs, expert witness fees, and reasonable attorney fees as allowed by statute or as otherwise allowed by law, and for any other and further relief that this Court shall deem just and proper.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted on May 9, 2025.

Civil Rights Litigation Group,

*s/ Raymond K. Bryant*
Raymond K. Bryant, Esq.
Zach L. Shiffler, Esq.
1543 Champa St., Suite 400
Denver, CO 80202
P: 720-515-6165
F: 720-465-1975
Raymond@rightslitigation.com